8154-0006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

JAMES C. McELWEE,

                                        Plaintiff,

                                                                    10 CIV 00138 (SCR)

        -against-

COUNTY OF ORANGE,

                                        Defendant
-----------------------------------------------------------------------x


**DEFENDANT'S SUPPLEMENTAL MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR DISMISSAL PURSUANT
TO FRCP 12(B)(6) OR SUMMARY JUDGMENT PURSUANT
TO FRCP 56**


McCABE & MACK LLP
David L. Posner
Karen Folster Lesperance
*Attorneys for Defendant*
63 Washington Street
P.O. Box 509
Poughkeepsie, NY 12602-0509
Tel: (845) 486-6800

8154-0006

# TABLE OF CONTENTS

**Page**

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Facts and General Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Argument

    12(b)(6) Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

    Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

POINT I

    Plaintiff Claims Fail as a Matter of Law Because Plaintiff
    is Not a Protected Individual Under Either the ADA or the
    Rehabilitation Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

        A.    Legal Standard Under the ADA and
               Rehabilitation Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

        B.    Plaintiff is Not Disabled as Defined by
               the ADA and the Rehabilitation Act. . . . . . . . . . . . . . . . . . . . . . . . . . .  13

        C.    Even if Plaintiff is Disabled, the Disability
               Was Not Known to Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

        D.    Even if Plaintiff Was Disabled, He is Not
               an Otherwise Qualified Individual. . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

POINT II

    Even if Plaintiff is a Protected Individual, His Claim Fails as a
    Matter of Law Because He Was Not Denied a Requested
    Reasonable Accommodation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

        A.    The "Accommodation" Referenced in the
               Complaint is Not a Reasonable Accommodation. . . . . . . . . . . . . . . .  22

        B.    Even if it Were Reasonable, Plaintiff's Claim Fails
               Because he Never Requested an Accommodation. . . . . . . . . . . . . . . .  25

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

8154-0006

## PRELIMINARY STATEMENT

This memorandum of law is respectfully submitted by Defendant Orange County in support of its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Defendants submit this supplemental memorandum of law pursuant to the Court's directive at a conference held on November 15, 2010, in which the Court indicated an intent to convert defendant's previously-filed 12(b)(6) motion into a motion for summary judgment.  This memorandum of law consolidates Defendant's argument for both dismissal pursuant to Rule 12(b)(6) and summary judgment pursuant to Rule 56, and supercedes the previously filed memorandum of law.

Plaintiff brings this claim under Title II of the Americans with Disabilities Act (the "ADA") and section 504 of the Rehabilitation Act.  He was a volunteer at The Valley View Center for Nursing Care and Rehabilitation ("Valley View"), which is alleged in the complaint to be a County agency.  Plaintiff contends that his services as a volunteer at Valley View were unlawfully terminated based on the fact that he has Asperger's Syndrome, and that he was therefore denied the benefit of public programs or services on the basis of a disability in violation of the ADA and the Rehabilitation Act.

The allegations of the Complaint, even if taken as true and given the benefit of all reasonable inferences, do not state a claim upon which relief can be granted.  Moreover, the affidavit of Robin Darwin (submitted herewith), who was the Assistant Administrator of Valley View during the relevant time period and who made the decision to terminate Plaintiff's volunteer services, clearly establishes that defendant was not aware that Plaintiff was disabled, and that his termination was the result of his behavior in the workplace and not related to an alleged disability.  As a result, summary judgment is also appropriate.

8154-0006

## FACTS AND GENERAL DISCUSSION

Plaintiff was a volunteer at Valley View beginning in 1996.  Id. at ¶ 9.  His volunteer duties there were primarily janitorial.  See Darwin Aff. at ¶4.   Plaintiff contends that he has Asperger's Syndrome, a "developmental disorder on the autism spectrum characterized by problems in socialization and communication skills."  Compl. ¶6.  He does not claim that his Asperger's affected his ability to volunteer at Valley View in any way.  In fact, he claims that "[f]or the duration of [his] relationship with Valley View,  he was regarded as a good and conscientious volunteer who greatly contributed to the facility."  Compl. ¶13.

On or about November 20, 2009, Martha Thompson, a staff member in the payroll department at Valley View, informed Robin Darwin, the assistant administrator, that Mr. McElwee was acting inappropriately towards her and making her feel uncomfortable.  Darwin spoke with Ms. Thompson at length about what was happening. See Darwin Aff. at ¶5, Exhibit "A".

Thomson told Darwin that she did not feel comfortable around Mr. McElwee.  She said that he waited for her in the "town center" (a central area of the facility available to staff, volunteers, residents and families of residents) and then walked behind her and followed her. She said she had caught him looking at her rear end  when he was following her in the halls. See Darwin Aff. at ¶6, Exhibit "A".

Ms. Thompson said that on September 25 of that year there was an incident where she walked past him in the hallway outside the cafeteria.  After she passed him she turned around to see if he was looking at her, and he had in fact stopped and turned around to look at her after she had passed.  She asked him what was going on and he said he thought someone was calling him. See Darwin Aff. at ¶7, Exhibit "A".

On other occasions Thompson was aware that Mr. McElwee was behind her while she

8154-0006

was walking past the switchboard, so she abruptly stopped so that he would pass her and keep going, but instead he stopped as well and waited for her to walk again.  It was clear to her that Mr. McElwee was following her and not just that he happened to be walking in the same direction.  <u>See</u> Darwin Aff. ¶8, <u>Exhibit "A"</u>.

Ms. Thompson also said that she had seen McElwee waiting in the gift shop, off of the town center, and felt that he was watching her and waiting for her to leave the town center area.  On another occasion she was in her parked car in the parking lot during a break, and she saw James in his car.  He moved his car to a parking spot two spots away from her, put his car window down, and watched her out his car window.   <u>See</u> Darwin Aff. at ¶¶9-10, <u>Exhibit "A"</u>.

Ms. Thompson also said that she was aware of at least two other women that Mr. McElwee had "bothered" or made to feel uncomfortable.  One was Liz Murphy, another payroll department employee at Valley View, and another woman who also worked at Valley View  whose name she could not remember but she was Wayne Beam's fiancé.  <u>See</u> Darwin Aff. at ¶11, <u>Exhibit "A"</u>.

Darwin later identified the latter as a woman named Yvonne who was also employed at Valley View.  Darwin spoke with Yvonne, who she confirmed that James would engage in similar behavior towards her, but that she would simply tell him to move on and she was not really bothered by it.  Darwin was still concerned by this, because it confirmed that he was engaging in this type of behavior with other female employees, at least some of whom were in fact bothered by it.  <u>See</u> Darwin Aff. ¶12.

On November 24, 2009, Darwin met with Mr. McElwee to inform him that the complaint had been made and to discuss the allegations with him.  Amy Fey, the Director of Activities at Valley View, was present for this discussion.  <u>See</u> Darwin Aff. ¶13.  Darwin told him that she had received a complaint from a female employee that he was making her feel

8154-0006

uncomfortable, and asked him if he had any idea who that might be.  He responded that he thought it was the social worker Lindsay.  It was not Lindsay who had made the complaint, so Darwin asked James why he would think that Lindsay would say that about him.  He responded that he "look[s] at her and talk[s] to her." See  See Darwin Aff. at ¶16, Exhibit "B".

Darwin told him it was not Lindsay, and he said then it might be a certain nurse's aid, whose name he did not know.  He said he "I talk to her too, and look at her." Id.  James then said that God was trying to punish him because of his "history."  Darwin asked him what he meant by that saying that when he was in high school he "made a mean phone call to a girl, saying nasty/dirty things" but the cops told him he was nice so nothing happened.  See Darwin Aff. at ¶¶17-18, Exhibit "B".

Ms. Fey then took James out of the room so that Ms. Darwin could call Ms. Thompson and ask her permission to disclose her identity to James.  While Darwin was still on the phone Ms. Fey returned with an ashen look on her face looking quite frightened.  She told Darwin that James had said "there needs to be punishment and now" while making a motion with his hand across his throat as if slitting his throat.   See Darwin Aff. at ¶19, Exhibit "B".

Darwin called James back into the office and asked him  what he meant when he said there needed to be punishment, and he responded "to myself.  I deserve to be punished when I do bad things."  He then started making faces like he was getting angry, and said "just when I think someone is going to pat me on the back someone stabs me."  As he said this, he first patted his back with an open hand, and then put his hand into a fist as if he were holding a knife and repeatedly made stabbing motions.  Darwin was disturbed and frightened by this. See Darwin Aff. at ¶¶20-21, Exhibit "B".

Darwin ultimately told James who had made the complaint about him, and he said "Oh, I should have known.  I had a feeling she was going to turn me in."   See Darwin Aff. at

8154-0006

¶23, Exhibit "B ".  Darwin told James not to have any contact with Martha whatsoever, and he left.  See Darwin Aff. at ¶24.

Also on November 24, 2009, Darwin spoke with the facility Administrator, Bill Pasocello, who advised her that if she were considering terminating Mr. McElwee's volunteer services that she should do some further investigating first.  See Darwin Aff. at ¶25, Exhibit "B".  The next day, November 25, 2009, Darwin informed James that she was disturbed by the situation, that she needed to look into it more, and that he needed to leave and not return until he heard from her.  See Darwin Aff. at ¶28, Exhibit "B".

He started to cry, and was saying that Darwin was a conduit of God, and that God would punish him for what he had done in the past.  He said that God was telling him he should not do these things anymore.  He also said he had been doing research at the library over the past several months about domestic violence and sexual harassment, to see if what he had been doing would be considered that.  Darwin considered this an indication that he knew what he was doing and knew that it was wrong.  See Darwin Aff. at ¶29, Exhibit "C".

On November 30, Darwin interviewed Liz Murphy, another staff member in the payroll department at Valley View.  Ms. Murphy reported that James watched her, and followed her when she went for a walk on her breaks.  She said that this behavior had been going on for a few years, and had escalated since the prior spring.  She said he was becoming was more visible and seemed to be there all the time.  She shared a recent incident in which she was distributing paychecks at the switchboard desk in the lobby, and James sat in the lobby and watched her the entire time she was working.  She moved her chair so that she would be in a position where she could not see him looking at her and he could not see her any longer.  See Darwin Aff. at ¶¶30-31, Exhibit "D".

Ms. Murphy said that she gave McElwee the "cold shoulder" and went out of her way

8154-0006

to avoid him.  She also said she had told a security guard, Eric, about James' behavior towards her and Eric told her he had had other complaints from women about James.  See Darwin Aff. at ¶32, Exhibit "D".

Darwin then spoke to Eric Gould, the security guard that Liz had complained to.  Mr. Gould said that both Martha Thompson and Liz Murphy had told him that James' behavior made them feel uncomfortable.  Martha told him that she observed James acting unprofessionally and inappropriately towards a woman who was walking either in or out of the facility wearing a revealing blouse.  Martha said that James acted excited and she did not feel comfortable with the way James acted around this woman.  See Darwin Aff. at ¶¶33-34, Exhibit "E".

Martha also complained to Eric of an incident where she was walking down the hall and James was walking behind her, and she stopped and turned around and caught him staring at her.  This made her feel very uncomfortable.  See Darwin Aff. at ¶35, Exhibit "E".  Eric also told Darwin that Liz Murphy had recounted to him an incident where she was handing out checks, and James had signed out for the day but didn't leave, and instead stayed and was watching her.  Liz asked Dayton Beck, the security guard on duty at the time, to ask James to leave, but Dayton would not.  See Darwin Aff. at ¶36, Exhibit "E".

Mr. Gould also had personally observed James acting inappropriately around female nursing students and visitors.  He told Darwin of one instance in which an attractive female was in the lobby, and he saw James go over to her, leaning in close to her and talking to her. He said he could tell by the woman's body language and expressions that she was very uncomfortable.  The woman turned away from James, and James made a motion with his hand, moving it by his hip.  Eric felt very uncomfortable seeing this, and told James it was time to go.  See Darwin Aff. at ¶37, Exhibit "E".

8154-0006

Finally, Mr. Gould told Darwin me that he had observed James around the female nursing students.  Eric said that James would act awkward and get red in the face around them, and would leer at them.  See Darwin Aff. at ¶38, Exhibit "E".

Also on November 30, 2009, Darwin spoke with Barbara Decker, another payroll department employee at Valley View.  Ms. Decker told Darwin that James had applied for a paid position a number of times and had been rejected.  She witnessed him banging his head against the wall saying "why won't you give me a job?" and he was escorted out.  See Darwin Aff. at ¶¶39-40, Exhibit "F".  Ms. Decker also said that he had a stuffed dolphin that he asked women to pet.  There was a sexual innuendo in the way he acted with the stuffed dolphin.  See Darwin Aff. at ¶41, Exhibit "F".

Ms. Decker also recounted an incident from several years prior, in which James had seen Ms. Decker and her daughter out Christmas shopping.  The next time she saw James at work he asked "Is that you daughter you were shopping with?  She's pretty.  I'd like to go out with her."  Ms. Decker told James her daughter was engaged and he responded that "engagements can be broken."  The way that James spoke about her daughter made Ms. Decker uncomfortable.  See Darwin Aff. at ¶42, Exhibit "F".

Ms. Decker also said that James used to "watch [her] with peering eyes", but that she did not make eye contact with him and she went out of her way to avoid him.  See Darwin Aff. at ¶43, Exhibit "F".

Darwin also interviewed Irene Simpson, Activities Supervisor at Valley View.  Ms. Simpson had not observed any troubling behavior from James recently, but over his fifteen years as a volunteer she had seen him numerous times engaging in what she called "overanxious" behavior, pacing and talking to himself and acting anxious.  He had been asked in the past not to come in due to this type of behavior.  See Darwin Aff. at ¶¶44-45, Exhibit

8154-0006

"G".

Ms. Simpson also said that James once said to her "Do you realize what I could do to you?" in what she felt was a physically threatening way, and she was concerned due to the fact that he was physically large that he might have the potential to be violent.  See Darwin Aff. at ¶46, Exhibit "G".  She also said that James was "overfriendly" to a girl in the office, coming in at lunch times and breaks to talk to her.  He was told to stop.  See Darwin Aff. at ¶47, Exhibit "G".

Ms. Simpson in the past had heard James get angry with himself for his own behavior, and has heard him telling himself that there will be consequences if he cannot be good, that he will have to stay home and will not be able to volunteer anymore.  See Darwin Aff. at ¶48, Exhibit "G".

Darwin also spoke with Pat Matero, the Director of Admissions at Valley View.  Ms. Matero said that James once came up to her and asked her how he would look in a speedo.  She said that in the past she had also observed him "playing up" to the young aides with sexual innuendo.  See Darwin Aff. at ¶¶49-50, Exhibit "H".

Finally, Darwin had a telephone conversation with Maureen (Coughlin) Torelli, who was the former Deputy Commissioner at Valley View.  During the time that Ms. Torelli was at Valley View, an issue arose with James' inappropriate behavior related to a dolphin puppet. She said he carried it around in a paper bag, and would take it out and ask residents to pet it. See Darwin Aff. at ¶¶51-52, Exhibit "I".

Based on all of these conversations Darwin concluded that Mr. McElwee was a potential liability in that he was sexually harassing staff, students, and visitors, and had exhibited disturbing and frightening behavior when confronted with these allegations.  She was concerned that there were young female students and volunteers in the facility on a

8154-0006

regular basis who may be particularly vulnerable.  She concluded that he could not be allowed to continue to volunteer.  See Darwin Aff. at ¶53.

After consulting with the facility Administrator, the County Executive's Office, and the County Law Department regarding the results of her investigation, she wrote James a letter on December 1, 2009, stating that his volunteer services were no longer needed and thanking him for his years of service.  See Darwin Aff. at ¶54, Exhibit "J".

Darwin was never told by Mr. McElwee or anyone else that he had Asperger's Syndrome or any other condition.  Any disability that he alleges he has played no role in the decision to terminate his volunteer services.  Darwin, with the consultation of others, made the decision because she was concerned with the number of female employees who said that James followed them and made them feel uncomfortable, as well as his behavior with female nursing students and visitors, and because of the things that he said to her and to Amy Fey and the behavior he exhibited when confronted with the complaint about him.  Darwin was concerned that he would do something to harm someone, or that Valley View would be exposed to complaints of sexual harassment in the workplace by the women who he made feel uncomfortable.   See Darwin Aff. at ¶55.

Plaintiff contends, however, that by terminating his volunteer position, he was denied participation in services, programs and activities of a public entity on account of his Asperger's Syndrome in violation of the ADA and the Rehabilitation Act.  Id. at ¶¶25, 26.  Specifically, plaintiff contends that by "not mak[ing] any effort to meet with plaintiff and Thompson to discuss Thompson's complaint about plaintiff and to . . .  educate Thompson about plaintiff's disability", defendant "fail[ed] to take steps to ensure that the volunteer program was being administered in a non-discriminatory manner" thereby "den[ying] plaintiff a reasonable accommodation under the Americans with Disabilities Act and the Rehabilitation

8154-0006

Act."  Id. at ¶15.

Defendant is entitled to dismissal of plaintiff's claims, or summary judgment in its favor.  The evidence clearly establishes that Plaintiff was terminated as a result of his workplace behavior, and not due to his Asperger's, of which defendant were not even aware.

First, plaintiff is not a disabled individual within the meaning of either the ADA or the Rehabilitation Act, as he is not substantially impaired in a major life activity as contemplated by the statutes at issue.  See Point I.B, infra.  Even assuming arguendo that he is a disabled individual, defendants were not aware of his disability and therefore cannot be held liable for an alleged failure to accommodate it.  See Point I.C., infra.

Moreover, even if plaintiff is disabled and was known to be disabled, he is not an "otherwise qualified" individual, a critical requirement of any such claim.  His actions in the workplace that led to the termination of his volunteer position rendered him not otherwise qualified.  See Point I.D., infra.

Finally, the accommodation that plaintiff contends should have been afforded him is not a reasonable accommodation within the purview of the ADA or the Rehabilitation Act.  See Point II.A., infra.  Additionally, plaintiff never requested an accommodation, relieving the County of liability for having allegedly failed to provide it.  See Point II.B., infra.

## ARGUMENT

### 12(b)(6) Standard

In reviewing a claim on a Rule 12(b)(6) motion, "a court will accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor."  Missel v. County of Monroe, 351 Fed. Appx. 543, 545 (2d Cir. 2009) (emphasis added).  "However, legal conclusions in the complaint are not factual allegations entitled to a presumption of truth, and a complaint that merely recites the elements of a cause of action without factual

8154-0006

support is insufficient." Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937 (2009); LaFaro v.

N.Y. Cardiothoracic Group, PLLC, 570 F.3d 471, 475-76 (2d Cir. 2009).  A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that  the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct

at 1949.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's

liability, it stops short of the line between possibility and plausibility of entitlement to relief."

Id. (quoting Twombly, 550 U.S. 557) (internal quotations omitted).

**Summary Judgment Standard**

Summary judgment will be granted if, after drawing all reasonable inferences in favor

of the non-moving party, no rational trier of fact could find in favor of that party. See Blank v.

Investec Ernst & Co., 2004 U.S. Dist. LEXIS 24008, *8-9 (S.D.N.Y. Nov. 18, 2004) (Duffy,

J.), citing Binder v. Long Island Lighting Co., 933 F.2d 187, 191 (2d Cir. 1991).  "Where, as

here, 'the nonmoving party bears the burden of proof as to a particular issue, the moving party

may satisfy his burden under Rule 56 by demonstrating an absence of evidence to support an

essential element of the nonmoving party's claim.'" Blank, 2004 U.S. Dist. LEXIS 24008 at

*8-9.

"For a plaintiff in a discrimination case to survive a motion for summary judgment, he

must do more than present 'conclusory allegations of discrimination;' instead he must offer

'concrete particulars' to substantiate the claim." Khan v. Universal Imaging Solutions, Inc.,

2001 U.S. Dist. LEXIS 13743, 13-14 (S.D.N.Y. Aug. 28, 2001) (Duffy, J.)., quoting Meiri v.

Dacon, 759 F.2d 989, 998 (2d Cir. 1985); Hunt v. Tektronix, Inc., 952 F. Supp. 998, 1002

(W.D.N.Y. 1997).

8154-0006

## POINT I

### PLAINTIFF'S CLAIMS FAIL AS A MATTER OF LAW BECAUSE PLAINTIFF IS NOT A PROTECTED INDIVIDUAL UNDER EITHER THE ADA OR THE REHABILITATION ACT

**A.     Legal Standard Under the ADA and Rehabilitation Act**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. §12132.  A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." Id. § 12131.

Similarly, the Rehabilitation Act requires that specified "otherwise qualified" disabled individuals receive reasonable accommodations from programs receiving federal financial assistance. 29 U.S.C. § 794(a); Alexander v. Choate, 469 U.S. 287, 301 (1985); Harris v. Mills, 572 F.3d 66, 73 (2d Cir. 2009); Henrietta D. v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003). Claims under section 504 of the Rehabilitation Act are "treated identically" to claims under Title II of the ADA.  Harris, 572 F.3d at 73; Henrietta D., 331 F.3d at 273; Tylicki v. St. Onge, 297 Fed. Appx. 65, 66 (2d Cir. 2008).

In order for a plaintiff to establish a *prima facie* violation under these Acts, he must demonstrate (1) that he is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; and (3) that he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated

8154-0006

against by defendants, by reason of his disability.  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84-85 (2d Cir.), corrected, 511 F.3d 238 (2d Cir. 2004); Harris, 572 F.3d at 73-74; Tylicki, 297 Fed. Appx. at 66-67; Blank,  2004 U.S. Dist. LEXIS 24008 at *9-10 (Duffy, J.)

The complaint in this case fails to state a prima facie case because the allegations cannot, as a matter of law, establish that plaintiff is disabled, that if he is disabled he is "otherwise qualified," or that he was denied the opportunity to participate in or benefit from defendants' services, programs or activities because of his alleged disability.  As such, the complaint should be dismissed pursuant to FRCP 12(b)(6).

Defendant is likewise entitled to summary judgment on this point, as Robin Darwin's affidavit clearly establishes that Valley View was not aware of the alleged disability, that McElwee was not significantly impaired in the major life activity of communicating and interacting with others, that McElwee was not "otherwise qualified" for his volunteer position by virtue of his unacceptable workplace behavior, and that the termination of his volunteer position was not because of his disability, but rather because of this inappropriate behavior.

**B.      Plaintiff is Not Disabled as Defined by the ADA and the Rehabilitation Act**

In order to meet the first element of a prima facie case under both the ADA and the Rehabilitation Act, plaintiff must first establish that he is disabled.  The Second Circuit follows "a three-step process for determining whether a plaintiff has a disability" that is protected by the ADA.  Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 641 (2d Cir. 1998); Bragdon v. Abbott, 524 U.S. 624, 631(1998).  The court considers: (1) whether the plaintiff suffered from a physical or mental impairment, (2) whether the life activity upon which the plaintiff relied constitutes a major life activity under the ADA, and (3) whether the plaintiff's impairment substantially limited the major life activity identified.  Colwell, 158 F.3d at 641;  Jacques v. DiMarzio, Inc., 386 F.3d 192, 201 (2d Cir. 2004).

Plaintiff contends that he has Asperger's Syndrome, which allegedly "substantially limits plaintiff's ability to communicate and associate with his peers and colleagues," thereby "substantially affect[ing] the major life activities of social interaction skills."  Compl. ¶¶ 6, 7. According to plaintiff, Asperger's Syndrome is a "developmental disorder on the autism spectrum characterized by problems in socialization and communication skills."  Compl. ¶6. Assuming these allegation are true, plaintiff has adequately alleged the first prong of the definition of disability under the ADA and Rehabilitation Acts – that plaintiff suffers from a mental impairment.  However, the allegations of the complaint fail to establish the second and third prong – that the identified activity qualifies as a "major life activity" and that plaintiff's impairment "substantially limits" that activity, entitling defendants to dismissal under Rule 12(b)(6).  Moreover, the evidence in this case is that Mr. McElwee was perfectly capable of being around other and initiating and responding to conversations, defeating any claim that he was substantially impaired in his ability to socialize and communicate, entitling the County to summary judgment.

Here, the activity identified as a "major life activity" is "social interaction skills" and plaintiff alleges that he is substantially limited in his "ability to communicate and associate with peers and colleagues."  Compl. ¶¶ 6-7.  In Jacques v. DiMarzio, inc., 386 F.3d 192 (2d Cir. 2004), the Second Circuit addressed for the first time whether "interacting with others" is a major life activity as envisioned by the ADA, a question which has been divisive amongst the Circuits and has yet to be addressed by the United States Supreme Court.  The Jacques court held that "getting along with others" is not a major life activity, whereas "interacting with others" is a major life activity.  See id. at 202-03. The Court distinguished the two by characterizing "getting along with others" as a "normative or evaluative concept", and quite subjective, whereas the major life activity of  "interacting with others" is "essentially

8154-0006

mechanical." Id. at 203.

The distinction becomes more clear as the Court delineates the standard for determining whether an individual plaintiff is substantially impaired in his ability to interact with others, the third prong of the definition of a disabled individual:

> We hold that plaintiff is "substantially limited" in "interacting with others" when the mental or physical impairment ***severely limits the fundamental ability to communicate with others***.  This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, i.e., to initiate contact with other people and respond to them, or to go among other people – at the most basic level of these activities.  The standard is ***not*** satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful.

Id. at 203 (emphasis added).  It is clear that, to be considered disabled under the ADA, a plaintiff must have a severe limitations on the ability to communicate at the most basic levels.

The complaint is completely devoid of any allegations upon which such a severe deficiency in the ability to communicate could be inferred.  Plaintiff alleges that he was satisfactorily performed all of the duties of his volunteer position for fifteen year.  Compl. ¶¶11, 13.  See Darwin Aff. at ¶4.  Plaintiff himself admits that he can interact and communicate at a basic level: "Had plaintiff been unable to 'interact at a basic fundamental level', Valley View Nursing Home could not have utilized him as a volunteer in assisting its residents for nearly 15 years."  See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Under Rule 12(b)(6) ("Pl. Opp."), at 8.  Thus, the complaint fails to adequately allege that plaintiff was substantially impaired in a major life activity, and must be dismissed.

Plaintiff claims that Martha Thompson's complaint about his behavior towards her, and Valley View's response to that complaint, were "criticisms about plaintiff's social interactions related directly to plaintiff's developmental disability."  Id. ¶ 16.  However, this

8154-0006

makes clear that it was his *manner* of interacting and not his *ability* to interact at a basic fundamental level that was impaired by Asperger's.  This is precisely the distinction made by the Jacques court, which made clear that such inappropriate or ineffective communication is not a substantial limitation of a major life activity as contemplated by the ADA.

In opposition to defendant's Rule 12(b)(6) motion, plaintiff placed great reliance on the fact that the Jacques court used "profound autism" as an example of a substantial limitation of the ability to interact with others is misplaced.  Plaintiff cites the following information about Asperger's Syndrome from WebMD: "People with Asperger's syndrome may not recognize verbal and nonverbal cues or understand normal social rules, such as taking turns talking or recognizing personal space."  The article goes on to distinguish Asperger's from autism: "Unlike those with autism, children with Asperger's syndrome usually have normal intelligence and language development (although the rhythm, pitch and emphasis are irregular.)" Pl. Opp. at 6, citing www.webmd.com/brain/autism/tc/aspergers-syndrome-topic-overview.  The full article from WebMD, which is Exhibit "A" to the Posner Affidavit dated October 7, 2010 (Docket No. 16), also indicates that people with Asperger's "[h]ave a very hard time relating to others.  It doesn't mean that they avoid social contact.  But they lack instincts and skills to help them express their thoughts and feelings and notice others' feelings."

It is clear from these descriptions that the symptoms of Asperger's syndrome directly relate to the "appropriateness, effectiveness, and successfulness" of communication skills and not with the ability to communicate at its most basic level.  The WebMD article cited by plaintiff highlights the key distinction between autism and Asperger's, namely that Asperger's does not carry the same language delays and deficiencies that are so prevalent with autism.   In fact, WebMD also reports that as many as 40% of individuals with autism ***never*** speak.  See

8154-0006

Autism - Symptoms, located at www.webmd.com/brain/autism/autism-symptoms, Exhibit "B" to the Posner Affidavit.

Thus, the fact that the <u>Jacques</u> court cited profound autism as an example of the kind of severe limitation that is necessary for a person to be considered substantially impaired in a major life activity under the ADA, supports and bolsters the defendant's interpretation of the <u>Jacques</u> standard.  To be disabled under the ADA on this basis, a plaintiff must indeed be unable to communicate at a basic fundamental level.  This is not alleged in the Complaint and plaintiff himself admits it is not the case.  Otherwise  he never could have occupied the volunteer position at Valley View that he held for years.  Pl. Opp. at 8.  As such, the complaint fails to state a claim upon which relief can be granted and must be dismissed.

Moreover, looking beyond the usual traits and symptoms of individuals with autism versus those with Asperger's Syndrome, the evidence presented in Robin Darwin's affidavit reveals that McElwee was not substantially limited in his ability to communicate or interact with others.  Ms. Darwin attests that Mr. McElwee was frequently seen talking to people, interacting with them, eating lunch with them, etc.  <u>See</u> Darwin Aff. at ¶4.  While the complaints of the numerous female employees who he made feel uncomfortable would suggest that perhaps is communication was inappropriate and/or ineffective, his fundamental ability to communicate is uncontroverted and uncontested.   As such, even if the court finds that the complaint adequately alleges a disability, the evidence clearly establishes that plaintiff was not substantially impaired in a major life activity, and the County is entitled to summary judgment accordingly.

**C.      Even If Plaintiff is Disabled, the Disability Was Not Known to Defendant.**

Nothing in the complaint alleges or infers that defendant knew or should have known that plaintiff had Asperger's Syndrome.  Nor is it alleged that plaintiff informed defendant

8154-0006

that he was limited in his abilities to communicate, if in fact he was.

Robin Darwin, the decision maker at Valley View and the person who informed Plaintiff that his volunteer services were being terminated, did not know that plaintiff had Asperger's Syndrome, or any other disability.  Darwin Aff. at ¶¶3, 55.

"Employers are obligated to make reasonable accommodations only to physical or mental limitations resulting from the disability of a qualified individual with a disability that is known to the employer. Thus, an employer would not be expected to accommodate disabilities of which it is unaware."  29 C.F.R. § 1630.9 (1994).  See also Stola v. Joint Indus. Bd., 889 F. Supp. 133, 135 (S.D.N.Y. 1995) (an "employer is obliged to accommodate only those disabilities that are obvious or called to its attention by the employee . . . If the employer acts without knowledge of the disability, it cannot reasonably be viewed as discriminating 'because of' that disability").

Thus, Defendant is entitled to dismissal and/or summary judgment on the independent grounds that, at the time of the complained-of action, they were not aware, nor should they have been aware, that plaintiff claimed a disability requiring an accommodation.

**D.     Even if Plaintiff Was Disabled, He is Not an Otherwise Qualified Individual**

Under both Title II of the ADA and the Rehabilitation Acts, a disabled individual must be "otherwise qualified" for the programs, services, or benefits of which he claims he was deprived.   "A disabled individual cannot be 'otherwise qualified' for a position if he commits misconduct which would disqualify an individual who did not fall under the protection of the statute."  Francis v. Runyon, 928 F. Supp. 195, 205 (E.D.N.Y. 1996).

Plaintiff alleges that his volunteer position was terminated because a female employee at Valley View complained to her supervisor that plaintiff had  "violated her personal space" and made her feel "uncomfortable".  Compl. ¶14.  However, the actual facts reveal that

8154-0006

plaintiff was engaging in a longstanding course of inappropriate conduct with numerous

female employees, nursing students, and visitors to the facility.

The complaint by Martha Thompson, the female staff member identified in the

complaint, sparked an investigation into Mr. McElwee's behavior.  After receiving Ms.

Thompson's complaint, Robin Darwin, the assistant administrator, and Amy Fey, Director of

Activities, met with plaintiff about these allegations.  Compl. ¶14, 16; Darwin Aff. at ¶13.

Darwin told Plaintiff  that a female employee had said that he was making her uncomfortable,

and asked plaintiff if he knew who that was.  See Darwin Aff. at ¶16, Exhibit "B".  Plaintiff

responded that it was probably the social worker Lindsay.  See id.  When asked why Lindsay

would have complained about him, plaintiff responded "Well I look at her and talk to her."

See id.

During the course of the meeting, plaintiff admitted to "looking at and talking to" at

least two female employees, and also told Darwin and Fey that when he was in high school he

made "a mean phone call to a girl, saying nasty/dirty things" and that the police were called as

a result of that incident. See id.  at ¶18.  He also stated that there "needs to be punishment and

now", while making a gesture to simulate slitting his throat.  When questioned about what he

meant by that, he said he deserved to be punished when he did bad things. See id. at ¶¶19-20.

His words and his behavior during this meeting were disturbing to Darwin, and she became

quite concerned about whether Mr. McElwee was a liability and whether it was safe to permit

him to continue to volunteer.

The day after her initial meeting with plaintiff, Darwin asked him to leave and not to

return to Valley View until he heard from her.  Over the course of the following week, she

conducted an investigation, during which she spoke with several other female employees of

the facility.  As is set forth in detail in the Statement of Facts, above, and in Robin Darwin's

8154-0006

affidavit and the exhibits thereto, this investigation revealed numerous instances of plaintiff

having acted in a sexually inappropriate manner, watching and following female employees,

watching them from inside a parked car in the parking lot, and making inappropriate

comments about at least one employee's daughter, which made them feel uncomfortable.  See

Darwin Affidavit at ¶¶27-32, 39-52.   A security guard at Valley View also recounted

incidents of his personal observations of plaintiff acting inappropriately around female visitors

and nursing students.  See Darwin Aff. at ¶¶33-38, Exhibit "E".

  After interviewing at least six female employees, the former deputy commissioner,

and a security guard at the facility, and after consultation with the Administrator of the

Facility, the County Executive, and the County Law Department, she informed plaintiff that

his volunteer services were no longer needed.  See Darwin Aff. ¶54, Exhibit "J".

  Due to plaintiff's conduct in the workplace, even if such conduct was a result of a

disability, he was not "otherwise qualified" for his volunteer position at Valley View.  In

Tylicki v. St. Onge, 297 Fed. Appx. 65, 67 (2d Cir. 2008), a student who had been expelled

from a community college following a number of violent outbursts, brought an action under

Title II of the ADA and section 504 of the Rehabilitation Act, alleging that his outburst was

the result of a mental impairment, and that he had been denied the programs and services of

the college as a result of his disability.  The Second Circuit affirmed the dismissal, pursuant to

Rule 12, of the plaintiff's complaint for failure to state a claim, holding that "the ADA and the

Rehabilitation Act permit [the college] to discipline a student even if the student's misconduct

is the result of disability. . . [The college] was entitled to suspend Tylicki even if his conduct

was a manifestation of his alleged disability."  Tylicki, 297 Fed. Appx. at 67, citing Sista v.

CDC Ixis North America, Inc., 445 F.3d 161, 172 (2d Cir. 2006) (ADA does not "require that

employers countenance dangerous misconduct, even if that misconduct is the result of a

8154-0006

disability").  See also Palmer v. Circuit Court, 117 F.3d 351, 352-353 (7th Cir. 1997) (cited with approval by the Second Circuit in Sista, supra) ("if an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act"); Ascani v. Hofstra Univ., 1999 U.S. App. LEXIS 7654 (2d Cir., Apr. 9, 1999) (A student who threatens her professor is not "otherwise qualified" even if the behavior was precipitated by her mental illness.); Husowitz v. Runyon, 942 F. Supp. 822, 834 (E.D.N.Y. 1996)(same).

Here, plaintiff's volunteer services were terminated after a reasonable investigation due to his actions and behavior towards female employees, students, and visitors, which made them feel uncomfortable and which subjected Valley View to potential liability for sexual harassment under Title VII if they took no action to remedy the conduct.  See, e.g., Jacques v. DiMarzio, Inc., 386 F.3d 192, 203 (2d Cir. 2004) (noting that the law will not force an employer faced with inappropriate conduct that is attributed to a mental impairment  "to choose between the risk of litigating that employee's ADA claim, or the risk of litigating the claims of others who experience an unchecked hostile work environment as a result of that employee's behavior.")

Moreover, where an employee is terminated for misconduct following a reasonable investigation, the courts are prohibited from acting as "super-personnel" departments, or from questioning the reasonableness of an employer's personnel and disciplinary decisions or the methods by which they arrived at those decision, in the absence of independent evidence that the process was tainted by discriminatory motive. See Waters v. Churchill, 511 U.S. 661, 676 (1994);  Ascione v. Pfizer, Inc., 312 F.Supp.2d 572, 578; Logan v. Caterpillar, Inc., 246 F.3d 912, 920 (7th Cir. 2001).  There are no allegations and no evidence in this case to suggest that anything about the manner in which Robin Darwin conducted her investigation was tainted by

8154-0006

the fact that plaintiff had an alleged disability.  In fact, Ms. Darwin was not even aware of that fact.  See Darwin Aff. at ¶¶3, 55.

The law is clear that the such inappropriate conduct renders plaintiff not otherwise qualified, and the ADA permits dismissal or other action in response to such conduct, even if that conduct is due to a disability.  It is equally clear that the law does not permit the courts to second guess personnel decisions so long as the employer engaged in a reasonable investigation that was not tainted by a discriminatory animus.  Thus, plaintiffs claim under the ADA and Rehabilitation Acts fail as a matter of law, and defendants is therefore entitled to summary judgment.

## POINT II

### EVEN IF PLAINTIFF IS A PROTECTED INDIVIDUAL, HIS CLAIM FAILS AS A MATTER OF LAW BECAUSE HE WAS NOT DENIED A REQUESTED REASONABLE ACCOMMODATION

**A.     The "Accommodation" Referenced in the Complaint is not a Reasonable Accommodation.**

The third element of a prima face case under either the ADA or the Rehabilitation Act is that plaintiff was denied the opportunity to participate in or benefit from defendant's services, programs, or activities, or was otherwise discriminated against by defendant, by reason of his disability.  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84-85 (2d Cir.), corrected, 511 F.3d 238 (2d Cir. 2004); Harris, 572 F.3d at 73-74; Tylicki, 297 Fed. Appx. at 66-67.  Discrimination on the basis of a disability includes the failure to make a reasonable accommodation.  See Henrietta D., 331 F.3d at 273; Tylicki, 297 Fed. Appx. at 66-67.

Here, plaintiff alleges that defendant "denied plaintiff a reasonable accommodation" in that Darwin, the assistant administrator of Valley View, "did not make any effort to meet with plaintiff and Thompson [the complaining female employee] to discuss Thompson's complaint

8154-0006

about plaintiff and to either educate Thompson about plaintiff's disability or to otherwise better understand the nature of her concerns about plaintiff." Compl. ¶15. It is this allegation on which the entire complaint hinges.

If plaintiff's allegations state a claim, that means that the ADA requires defendant to educate and counsel employees to "be more understanding" of a co-worker's harassing actions simply because he has a disability, and to tolerate conduct which is likely actionable under Title VII or other laws prohibiting sexual harassment in the workplace, simply because the perpetrator of that otherwise unlawful conduct is acting that way because of a disability. That is simply not the law, and the ADA imposes no such burdens. Nor does the ADA require that defendant react to plaintiff's conduct towards its employees (or volunteers) less harshly than it would react to the same conduct from a non-disabled individual. See Point I.D., supra, and cases cited therein.

In Harris v. Mills, 572 F.3d 66 (2d Cir. 2009), the plaintiff, a doctor of osteopathic medicine whose license to practice medicine had been revoked, brought an action against the State Board of Regents and others stemming from their denial of his petition to have his license reinstated. His license had been revoked after he admitted wrongdoing following investigation by the New York State Board for Professional Medical Conduct. The Board found that Plaintiff had, *inter alia*, made fraudulent misstatements in applications to reappointments to three different hospitals, including failing to disclose that he was the subject of an investigation by the Bureau of Controlled Substances for allegations of illegally storing and dispensing controlled substances, and had provided negligent and incompetent medical care. See id. at 69.

In his action against the Board of Regents and others, he claimed that his actions leading to the revocation of his license resulted from a mental impairment, and that the Board

8154-0006

violated Title II of the ADA and section 504 of the Rehabilitation Act by failing to take his impairment into account in deciding not to reinstate his license.  See id.

In his complaint, plaintiff alleged that he had sought, as a reasonable accommodation, the Board's "understanding of the impact of his [disabilities]" such that the Board would take them into consideration in reaching a decision on his petition for reinstatement.  Id. at 71. This is essentially the same accommodation that plaintiff in this case seeks – Mr. McElwee alleges that he was denied a reasonable accommodation in that defendant did not take steps to "better understand" the situation or to "educate" the complaining female as to the nature of plaintiff's disability.  Compl. ¶15.  The Second Circuit, in affirming the Rule 12(b)(6) dismissal of plaintiff's complaint in Harris, unequivocally stated that overlooking or acting more leniently in regards to improper conduct because it may have been caused by a disability is **_not_** a reasonable accommodation and is not required by the ADA or Rehabilitation Act:

> Harris thus alleges, at core, that if only the defendants would "understand" the impact of his disabilities, they would be willing to overlook the actions that caused him to lose his license in the first place. Generally construed, this allegation amounts only to the contention that Harris's medical licensing qualifications should be relaxed in light of his disability.
>
> This is not a reasonable accommodation claim. Title II of the ADA requires the accommodation of disabled persons who are entitled to a public benefit "whether or not [they are] given an accommodation." *Powell, 364 F.3d at 84-85*;  *see also 42 U.S.C. § 12131* ("The term 'qualified individual with a disability' means an individual with a disability who, *with or without reasonable modifications to rules, policies, or practices* . . . meets the essential eligibility requirements for [the relevant benefit]." (emphasis added)). The paradigmatic example is a person who must use a wheelchair to access the courts -- a citizen is entitled to access the court system irrespective of whether he or she can walk. *See Tennessee v. Lane, 541 U.S. 509, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004).* Here, by contrast, Harris would be entitled to a reinstatement of his license only if his disability is accommodated by the state's relaxation of its license qualifications. **Title II of the ADA requires no such diminishment of otherwise applicable standards.** *See Felix v. N.Y. City Transit Auth., 324 F.3d 102, 107 (2d Cir. 2003)* ("The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled; it does not authorize a preference

8154-0006

for disabled people generally").

<u>Harris</u>, 273 F.3d at 74 (emphasis added).  <u>See also</u> <u>Southeastern Community College v. Davis</u>, 442 U.S. 397, 413 (1979) (Section 504 of the Rehabilitation Act does not require a lowering or substantial modification of standards to accommodate a disability).

Simply put, defendant received a complaint from an employee that one of their volunteers was acting in a way as to make her uncomfortable.  They investigated this complaint, and terminated the services of this volunteer as a result of that investigation.  The fact that plaintiff alleges he is a disabled individual under the ADA does not render this action improper or unlawful, even if the conduct at issue resulted from the alleged disability.  Accordingly, defendant is entitled to summary judgment dismissing the complaint.

**B.      Even if it Were Reasonable, Plaintiff's Claim Fails Because He Never Requested an Accommodation.**

Finally, plaintiff's claim fails because he never requested the accommodations that he now claims he should have been given but was not. "In general . . .  it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."  29 C.F.R. § 1630.9 (1994).  A defendant will not be held liable for failing to provide an accommodation that was never requested.  <u>See also</u> <u>Stola v. Joint Indus. Bd.</u>, 889 F. Supp. 133, 135 (S.D.N.Y. 1995); <u>Batlidze v. Harris Beach, LLP</u>, 361 Fed. Appx. 216 (2d Cir. 2010) (affirming dismissal of ADA complaint where plaintiff failed to request a reasonable accommodation to perform the essential functions of her job or demonstrate that she could perform the essential functions of her job with or without a reasonable accommodation); <u>Graves v. Finch Pruyn & Co.</u>, 457 F.3d 181, 184 (2d Cir. 2006) ("generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed").

8154-0006

Just as defendant cannot be held liable for not accommodating a disability that it was not aware of (see Point I.C., supra), neither can it be liable for failing to make an accommodation that was never requested.

### CONCLUSION

For all the foregoing reasons, Plaintiff's complaint in this action fails as a matter of law.  Defendant respectfully requests that the complaint be dismissed, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, that Defendant be granted summary judgment pursuant to Federal Rule of Civil Procedure 56, and that this Court order such other and further relief as it deems just and proper.

Dated: Poughkeepsie, New York
       December 13, 2010

                               _____
                               DAVID L. POSNER (0310)