UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JAMES C. McELWEE,

               Plaintiff,

-vs-                             10 Civ. 138 (KTD)

COUNTY OF ORANGE,

               Defendant.
-------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STEPHEN BERGSTEIN

BERGSTEIN & ULLRICH, LLP
15 Railroad Avenue
Chester, New York 10918
(845) 469-1277
Counsel for plaintiff

**TABLE OF CONTENTS**

INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.  Plaintiff's disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.  Valley View Nursing Home  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    3.  Complaints about plaintiff at Valley View  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    4.  Defendant terminates plaintiff from the volunteer program  . . . . . . . . . . . . . . . . . 8

ARGUMENT:        THE JURY COULD FIND THAT THE
                             COUNTY DISCRIMINATED AGAINST
                             McELWEE BECAUSE OF HIS DISABILITY IN
                             VIOLATION OF FEDERAL LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

POINT I:         PLAINTIFF MAKES OUT A *PRIMA FACIE* CASE
                             OF DISABILITY DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  Plaintiff is Disabled under Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.  Defendants Were Aware of Plaintiff's Disability  . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.  Plaintiff Was a Qualified Individual under Federal Law . . . . . . . . . . . . . . . . . . . 17

POINT II:        PLAINTIFF WAS DENIED A REASONABLE ACCOMMODATION  . . . . . . 19

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

*Brady v. Wal-Mart Stores*, 531 F.3d 127 (2d Cir. 2008) ...................... 15, 17-18, 22

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ............................................. 11

*Felix v. New York City Transit Auth.*, 154 F. Supp. 2d 640 (S.D.N.Y. 2001) ............... 15

*Francis v. Runyon*, 928 F. Supp. 195 (E.D.N.Y. 1996) ................................. 18

*Graves v. Finch Pruyn & Co.*, 457 F.3d 181 (2d Cir. 2006) ............................. 22

*Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009) ................................... 10, 11, 21

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) ............................... 19

*Jacques v. DiMarzio*, 386 F.3d 192 (2d Cir. 2004) ............................. 12, 14, 15

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537 (2d Cir.2010) ........................... 9-10

*Palmer v. Cook County*, 117 F.3d 351 (7th Cir. 1997) ................................ 18

*Powell v. National Board of Medical Examiners*, 364 F.3d 79 (2d Cir. 2004) ........... 10-11

*Sista v. CDC Ixis North America*, 445 F.3d 161 (2d Cir. 2006) ...................... 17-18

*Toyota Motor Mfg. v. Williams*, 524 U.S. 184 (2002) ................................ 14

*Tylicki v. St. Onge*, 297 Fed Appx. 65 (2d Cir. 2008) .............................. 18, 19

*Weixel v. Board of Education*, 287 F.3d 138 (2d Cir. 2002) ........................... 11

## INTRODUCTION

Plaintiff James C. McElwee brings this action under the Americans With Disabilities Act, the Rehabilitation Act and state law. Plaintiff asserts that defendant County of Orange discriminated against him in terminating his involvement in the volunteer program at Valley View Nursing Home, a public facility. Defendant also discriminated against McElwee in banishing him from the facility. Plaintiff alleges that defendant took action against McElwee because of his disability, Asperger's Syndrome. Defendant moves for summary judgment. For the following reasons, this Court should deny the motion.

## STATEMENT OF FACTS

### 1. Plaintiff's disability

James C. McElwee is formally diagnosed with Pervasive Developmental Disorder Not Otherwise Specified, though "it may be best to indicate that he is diagnosed with an autism spectrum disorder, because that is a term increasing familiar to the general public." (Exhibit 8 to Bergstein aff., at 2). In light of the complex nature of plaintiff's disability, his therapists note that "he cannot strictly be diagnosed with Asperger's Disorder." *Id.* at 1.

Plaintiff's disability affects his socialization and communication skills. (Loretta McElwee decl. ¶¶ 1, 5-10). This disorder substantially limits plaintiff's ability to communicate and associate with peers and colleagues. *Id.* As recognized by 24 C.F.R. § 9.103, plaintiff's life-long mental impairment substantially affects major life activities, *i.e.*, social interaction skills. *Id.* It also affects plaintiff's ability to care for himself and to work. *Id.* at ¶¶ 11-13.

Plaintiff's school records have long referenced his developmental disability. (Exhibit 1 to Loretta McElwee decl.). Moreover, plaintiff's psychological evaluation, dated August 13/20, 2009, notes that he is a 35 year-old man who lives with his mother. (Exhibit 2 to Loretta McElwee

decl., at 1). Plaintiff has low intellectual functioning, with a full Scale IQ score of 79. *Id.* at 2. Early on, his behavior was consistent with Pervasive Developmental Disorder or an autistic spectrum disorder. *Id.* Later, after he was diagnosed with atypical mood or bipolar disorder, "the true diagnosis of PDD became apparent. Mr. McElwee demonstrated stereotyped mannerisms, inflexible, perseverative thinking, extreme misinterpretation of social cues, and poor interpersonal relationships." *Id.* The report adds, "Mr. McElwee himself had recognized how much he has improved in anger control and self-esteem. In contrast, he has trouble understanding how he distorts the meaning of others' actions and how this behavior contributes to poor interpersonal relationships with others." *Id.* The report further notes that "[h]e moves awkwardly. ... Eye contact is intermittent and peculiar in intensity. Speech has a singsong prosody; facial expressions are exaggerated and distorted, sometimes not consistent with the feeling he is expressing. Anxiety is manifest." *Id.* at 3. The report also describes plaintiff's personality traits that are consistent with his developmental disability. He is unable to manage his medical needs, "such as keeping track of his medication and scheduling medical appointments." He has only "simple" food preparation skills and "minimal" cleaning skills. The report also describes plaintiff's socialization skills,

> Among the subdomains of Socialization, Interpersonal Relationships was the weakest. Mr. McElwee had one close friend, whom he had known through high school and with whom he visited regularly. He did not express concern or happiness for others nor recognize other people's likes and dislikes. At times, but not consistently, he initiated small talk, discussed common interests with others and maintained appropriate interpersonal distance. He had trouble understanding that people could not "read" his thoughts and he was often not careful about what he said in public. For example, angry about something he could not do, he muttered to himself loud and long enough to concern the librarian who knew him well. Considering the subdomain Leisure Time, a significant strength was his going out with his friend without "adult supervision." However, most of his social interactions with peers were within the framework of structured group activities. He did not play complex

2

board or electronic games, could not follow rules in sports, and was not sensitive to interrupting others. *Id.* at 5.

The report assesses plaintiff's Asperger Syndrome Quotient at 97, "indicating that the probability of his being diagnosed with Asperger's was average." "Examples of characteristics on the subscale Language were his tendency to talk excessively about what he liked whether or not it interested others, to interpret conversations literally, and to speak with off prosody. Characteristics under Social included difficulty understanding the feelings of others and social cues, showing inappropriate facial expressions, and having few friends despite wanting them." *Id.* at 6. The report concludes that "his symptoms are more severe than expected for someone with Asperger's Disorder; therefore the diagnosis of [Pervasive Developmental Disorder - Not Otherwise Specified] is a better fit." *Id.* at 7.

In a report dated January 13, 2011, plaintiff's therapists summarize the state of plaintiff's disability. They write:

> Mr. McElwee's impairment in social interaction is manifested by peculiar facial expressions and body postures. Eye-contact is either fleeting or too intense. Gestures are exaggerated. He does not respect the personal space of others. His voice is odd in prosody (rhythm and inflection) and too loud. Moreover, he lacks social reciprocity. He talks about what interests him without regard for whether the other person wants to hear it. He does not listen to what other people say and cannot see matters from another person's point of view so he has difficulty understanding their feelings. He does not respond to social cues (body language) such as when people are having a private conversation, when the topic is inappropriate to the situation, when it is time to change the subject, when he is making someone uncomfortable.
>
> * * *
>
> Repetitive, stereotyped characteristics are seen in his behavior, communication, and thought process, and anxious when matters do not go as expected. Repetitive motor mannerisms include rubbing his leg and twisting his hands. Unless he is engaged in an activity, these movements are nearly

3

constant when he is talking to someone. ... When things go wrong, he panics. He lost his keys and talked endlessly (for days) about how he would be punished for what he perceives as a major failing. When someone disagrees with him, he overreacts and tries to get justification for his pont of view for weeks after the event. (Exhibit 8 to Bergstein aff., at 2).

Accordingly, plaintiff's mother attests that anyone speaking to James McElwee would know that he is developmentally-disabled. (Loretta McElwee decl. ¶ 5). Her description of plaintiff's mannerisms and speaking style resembles the psychological evaluation annexed to her declaration as Exhibit 2, as well as the January 13, 2011 report. She notes, "[b]ased on my experience as his mother, it is apparent to almost anyone (young adults to older people) that James is 'different.'" *Id.* at ¶ 5. Not only is his body language exaggerated, *id.* at ¶ 6, but his condition conflicts with proper socialization and communication, *id.* at ¶ 7, and he has a lack of affect. *Id.* at ¶ 8. He "does not readily pick up on social cues and he is often unable to read or interpret body language, start or maintain a conversation or take turns talking." *Id.* at ¶ 9. He is also immature. *Id.* at ¶ 10.

### 2. Valley View Nursing Home

County of Orange operates Valley View Center for Nursing Care and Rehabilitation, located in Goshen, New York. Offering comprehensive rehabilitation and specialized sub-acute services (Complaint ¶ 8), the facility operates a formal volunteer program, comprised of 20 to 30 volunteers. This program has a volunteer director, coordinates hours and tasks for volunteers and has an annual recognition program, providing pins, certificates and awards, to reward volunteers for their service. (Plaintiff decl. ¶ 4).

In 1996, plaintiff began volunteering at Valley View, helping staff and residents with housekeeping responsibilities, *i.e.*, janitorial assignments and transporting residents within the

4

building to and from religious and social activities. *Id.* at ¶ 3. The volunteer program benefits plaintiff and other disabled volunteers as it improves their self-esteem and allows them to integrate within the larger community by providing a much-needed service to the elderly and infirm. This is particularly true for autistic volunteers like plaintiff who lack the interactive social skills to consistently perform other jobs but want to productively serve the community and improve their vocational and professional skills. *Id.* at ¶ 5.

From 1996 until his termination from the volunteer program in November 2009, plaintiff worked four days a week, between the hours of 9:00 a.m. and 3:00 p.m. *Id.* at ¶ 3. For the duration of plaintiff's relationship with Valley View, he was regarded as a good volunteer. (Exhibit B to Darwin aff.) (Darwin told plaintiff that "you do a good job volunteering").

### 3.  Complaints about plaintiff at Valley View

Robin Darwin was assistant administrator at Valley View Nursing Home from 2006 through September 2010). (Darwin dep. 6) (annexed to Bergstein aff. as Exhibit 1). Although she has a Master's degree in health services and management (*id.* at 5), she claims to know little about autism. She also claims she never heard of Asperger's Syndrome before plaintiff filed this action. *Id.* at 14.

Prior to the events giving rise to this action, Darwin was aware of plaintiff, having seen him interact with others at the facility "on numerous occasions." (Darwin aff. ¶ 4). Although Darwin claims that she was unaware of plaintiff's disability before he filed this action, she testified that while she never had an extended conversation with plaintiff prior to November 2009, "he may have appeared to look a little slow," *i.e.*, "just his look, his face." (Darwin dep. 12, 13). Prior to November 2009, Darwin had not heard anything negative about plaintiff. *Id.* at 12.

However, on November 24, 2009, Darwin told plaintiff that a social worker, Martha Thompson, complained that plaintiff violated her personal space and walked behind her and that she felt uncomfortable around him. (Plaintiff decl. ¶¶ 6-12). Thompson also told Darwin that plaintiff had waited for her in the parking lot. *Id.* at ¶ 12.

Darwin's notes of her conversation with plaintiff reflect his unusual mannerisms and speaking style. When Darwin asked plaintiff why a female co-worker would feel uncomfortable around him, this 35 year-old man said, "because I talk to her and look at her." (Exhibit B to Darwin aff.). He then said, "God is trying to punish me for something" and mentioned an incident from high school when "I made a mean phone call to a girl, saying nasty/dirty things. The cops told me I was nice so nothing happened." Moments later, plaintiff said, "there needed to be punishment now" and he made a motion to slit his throat and said that maybe he deserved to hurt himself. In her notes summarizing the conversation, Darwin then recalled that plaintiff "starts making weird faces – screwing up his nose and mouth like he is really angry – I can't even describe." She then quotes plaintiff saying, "just when I think someone is going to pat me on the back someone stabs me." She next observed that "he makes the patting on the back motion on his back and then stabbing motion into his back. This is very disturbing to watch." *Id.* at 2. After Darwin told plaintiff that he could not work in the facility until she decided what to do, plaintiff "started to cry and said God was telling him something through me and that he should be a priest so he didn't do these things anymore. He said he didn't know what to tell his mother, that she would say, 'I told you so.'"

Although Darwin told plaintiff that his alleged misconduct was a recent development (she said, "[t]his is something new that you are doing" *Id.*), she decided to further investigate plaintiff. When Darwin told plaintiff that she "needed to look into it more, and that he needed to leave and not

6

return until he heard from me," he "started to cry, and was saying that I was a conduit of God, and that God would punish him for what he had done in the past. He said that God was telling him he should not do these things anymore." (Darwin aff. ¶¶ 25, 28-29). Darwin then spoke with other women who also said that plaintiff made them feel uncomfortable. *Id.* at ¶¶ 30-52. No one accused plaintiff of touching or threatening them. However, plaintiff's affidavit places these episodes in context, denying that he intentionally followed women around the facility, looked at them sexually or made inappropriate statements. Some of the incidents took place more than 10 years ago, without any consequence. *See*, Plaintiff decl. ¶¶ 6-24. After speaking with these women, Darwin decided to terminate plaintiff's association with the facility. (Darwin aff. ¶ 53).

Darwin made no effort to meet with plaintiff and Thompson to discuss Thompson's complaint and to either educate Thompson about plaintiff's disability or to otherwise better understand the nature of her concerns about plaintiff. (Plaintiff decl. ¶¶ 24-25). As plaintiff attests:

> No one at the nursing home ever suggested a meeting with any of my colleagues about my disability and how to increase awareness about Asperger's and autism in general. These educational efforts would have acquainted colleagues about the nature of my disability and reassured them that while they might interpret my behavior as unusual, I was harmless, and that any unusual behavior was a product of my disability, which affects my social interactions.
>
> I never had a sit-down meeting with Martha Thompson about my disability, and prior to our meeting shortly before my termination, I never had the opportunity to explain myself and place anything that I did in context. *Id.* at ¶ 24-25.

Darwin testified that she did not consider consulting with any doctors or health professionals about plaintiff's behavior at the facility. (Darwin dep. 25). The County has not trained anyone to handle personnel disputes arising from developmental disabilities. *Id.* at 25. Darwin did

7

not consider having plaintiff meet with any of the women who complained about him to discuss his behavior. *Id.* at 28. She testified that her primary concern was that plaintiff was engaging in sexual harassment. *Id.* at 25, 28-29. The Complaint alleges that, in failing to take these steps to ensure that the volunteer program was being administered in a non-discriminatory manner, Darwin denied plaintiff a reasonable accommodation under federal law. (Complaint ¶ 15).

### 4.    Defendant terminates plaintiff from the volunteer program

On November 30, 2009, plaintiff's mother called Darwin to complain that he "[should not] be discriminated [against] because [he was] looking at people." (Exhibit 2 to Bergstein aff.). She added that the facility did not "want to discriminate because he has a disability. This is his life – very upset." *Id.* at 1. Darwin spoke with another facility official that day, who told her, "don't talk to mother." *Id.* at 2. Darwin did not ask Loretta McElwee any follow-up questions about plaintiff's disability. (Loretta McElwee decl. ¶ 14). Despite Loretta McElwee's insistence that plaintiff is disabled and that the County was discriminating against him, on December 1, 2009, Darwin mailed plaintiff a letter that terminated his volunteer services at Valley View. (Exhibit J to Darwin aff.). On December 2, 2009, plaintiff's psychologist faxed a note to Darwin asking to "discuss situation of Nov. 24." (Exhibit 3 to Bergstein aff.). As her decision was final (Exhibits 4 and 6 to Bergstein aff.), although she had just completed her investigation into plaintiff's conduct, Darwin did not call Dr. Lalire back. (Exhibit 8 to Bergstein, aff., at 3)

On December 10, 2009, plaintiff and other special-needs persons arrived at Valley View to sing Christmas carols for the residents. This small group of individuals, including plaintiff, has sung carols at the facility for several years. (Plaintiff decl. ¶ 27). When plaintiff arrived at the facility, the security guard said he was not allowed inside the building because of "what had

8

happened recently." Although another member of plaintiff's group told the security guard, Eric Gould, that plaintiff was with the caroling group, Gould said that he had an "order" prohibiting plaintiff from entering the building. (Plaintiff decl. ¶ 27). *See also*, Exhibit 5 to Bergstein aff. (Incident Report dated December 10, 2009). Darwin confirmed that plaintiff was banished from the facility. (Darwin dep. 26-27).

**ARGUMENT**

**THE JURY COULD FIND THAT THE COUNTY
DISCRIMINATED AGAINST McELWEE BECAUSE
OF HIS DISABILITY IN VIOLATION OF FEDERAL LAW**

"In determining whether the moving party is entitled to judgment as a matter of law, or whether instead there is sufficient evidence in the opposing party's favor to create a genuine issue of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.' ... And in reviewing all of the evidence to determine whether judgment as a matter of law is appropriate, 'the court must *draw all reasonable inferences in favor of the nonmoving party,*' 'even though contrary inferences might reasonably be drawn.' Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit, for the court in considering such a motion '*must disregard all evidence favorable to the moving party that the jury is not required to believe.*'" *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545-46 (2d Cir. 2010) (emphasis supplied).

Moreover, "[i]n reviewing the evidence and the inferences that may reasonably be drawn, the court '*may not make credibility determinations or weigh the evidence ... 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts*

9

*are jury functions, not those of a judge.'* 'Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate.'" *Id.* at 546 (emphasis supplied).

**POINT I**

**PLAINTIFF MAKES OUT A *PRIMA FACIE***
**CASE OF DISABILITY DISCRIMINATION**

Under Title II of the Americans With Disabilities Act, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To assure that those requirements are met, 'reasonable accommodation' may have to be provided to the qualified individual." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009).

"The ADA, which serves to protect the rights of individuals with disabilities, states that a disabled individual is one who suffers from 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual.' Title II of that Act proscribes discrimination against the disabled in access to public services. Section 202 states '[N]o qualified individual with a disability shall ... be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' A qualified individual with a disability is defined as a disabled person who, whether or not given an accommodation, 'meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.' Title II applies to any state or local government or instrumentality of a state or local government." *Powell v. National Bd. of*

10

*Medical Examiners*, 364 F.3d 79, 84-85 (2d Cir. 2004).

The Rehabilitation Act requires that "otherwise qualified" disabled individuals receive reasonable accommodations from programs receiving federal financial assistance. 29 U.S.C. § 794(a). The ADA and Rehabilitation Act are interpreted identically. *Harris*, 572 F.3d at 73.

"In order for a plaintiff to establish a *prima facie* violation under these Acts, []he must demonstrate (1) that []he is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; and (3) that []he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of h[is] disability." *Harris*, 572 F.3d at 73 -74.

### A. Plaintiff Is Disabled under Federal Law

"Both statutes define a 'disabled individual' as one who '(I) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.' 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(2). In determining whether an individual has a disability for purposes of the ADA and Section 504, we have applied the three-step approach taken by the Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624 (1998)." *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002).

"Plaintiff must first show that she suffers from a physical or mental impairment. Second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a 'major life activity.' Third, the plaintiff must show that her impairment 'substantially limits' the major life activity previously identified. In addition, the Supreme Court has recently clarified that the identified major life activity must be 'of central importance to daily life.'" *Id.*

11

Major life activities under the recently-amended Americans With Disabilities Act include "caring for oneself, performing manual tasks, seeing, hearing, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working." 42 U.S.C. § 12102(2)(A).

In *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 203-04 (2d Cir. 2004), the Second Circuit held that "a plaintiff is 'substantially limited' in 'interacting with others' when the mental or physical impairment severely limits the fundamental ability to communicate with others. This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, *i.e.,* to initiate contact with other people and respond to them, or to go among other people – at the most basic level of these activities. The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful. A plaintiff who otherwise can perform the functions of a job with (or without) reasonable accommodation could satisfy this standard by demonstrating isolation resulting from any of a number of severe conditions, including acute or profound cases of: autism, agoraphobia, depression or other conditions that we need not try to anticipate today."

The symptoms of Asperger's are well-known. As set forth in WebMD:

Asperger's syndrome (or disorder) is a developmental disorder in which people have severe difficulties understanding how to interact socially. People with Asperger's syndrome may not recognize verbal and nonverbal cues or understand normal social rules, such as taking turns talking or recognizing personal space.

Asperger's syndrome and autism belong to a class of disorders called pervasive developmental disorders. Asperger's syndrome shares some similarities with autism. Like those with autism, children with Asperger's syndrome have abnormal social interactions, facial expressions, and gestures, and unusually focused interests. Unlike those with autism, children with

Asperger's syndrome usually have normal intelligence and language development (although the rhythm, pitch, and emphasis are irregular), age-appropriate self-reliance, and interest in the world around them.[1]

The jury may find that McElwee is disabled under federal law. Plaintiff's therapists have formally diagnosed him with Pervasive Development Disorder Not Otherwise Specified, noting that he "cannot strictly be diagnosed with Asperger's Disorder." (Exhibit 8 to Bergstein aff., at 1). Plaintiff's disability is characterized by deficient socialization and communication skills. This disorder substantially limits plaintiff's ability to communicate with his peers and colleagues. Loretta McElwee's affidavit describes plaintiff's mannerisms and the nature of his disability. Exhibit 2 to her affidavit consists of a 2009 psychological report, which outlines plaintiff's disability in detail. Exhibit 8 to the Bergstein affirmation further details the nature of plaintiff's disability and his socialization problems. The common thread running through these narratives is plaintiff's lack of social skills and immaturity occasioned by his disability. As McElwee's condition substantially affects his social interactions, and the Second Circuit in *Jacques* recognized that a profound case of autism constitutes a severe condition under the ADA, 386 F.3d at 204, summary judgment is improper.

Plaintiff is also unable to adequately care for himself, manage his medical needs or work an everyday job. (Loretta McElwee decl. ¶¶ 11-13). These are also hallmarks of an ADA-protected disability. *See*, 42 U.S.C. § 12102(2)(A) (noting that working and caring for one's self constitute "major life activities" under the ADA). As these activities "are of central importance to daily life,"

---

[1] *See*, www.webmd.com/brain/autism/tc/aspergers-syndrome-topic-overview. Courts have cited WebMD as a source of medical information. *See, Abrams v. Port Authority Trans-Hudson Corp.*, 2010 WL 1265190, at *1, n.2 (D.N.J. 2010); *Decker v. Dunbar*, 633 F. Supp. 2d 317, 342 (E.D. Tex. 2008); *Whitlow v. Visiting Nurse Ass'n of Western New York*, 420 F. Supp. 2d 92, 96 n.3 (W.D.N.Y. 2005).

the jury may find that plaintiff is substantially limited in these areas. *Toyota Motor Mfg v. Williams*, 534 U.S. 184, 198 (2002).

Defendant argues that plaintiff cannot be "substantially limited" in the major life activity of interacting with others because he "was perfectly capable of being around others and initiating and responding to conversations." (Def. br. at 14). This is a fact issue for the jury. While defendant argues that "a plaintiff must have a severe limitation on the ability to communicate *at the most basic level*" (Def's br. at 15) (emphasis supplied), they are splitting hairs in suggesting that the poor social skills exhibited by someone with Asperger's does not satisfy that legal standard. *Id.* at 16. An impairment is "substantially limiting" if the plaintiff is "significantly restricted as to the condition, manner or duration which an individual can perform a major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). Like many persons with autism, plaintiff's social skills are quite limited. In comparison to "the average person in the general population," plaintiff's interactive skills are substantially limited. That fact that plaintiff is able to communicate with others in some ways does not mean he cannot satisfy this standard.

The County further argues that the factual allegations surrounding plaintiff's interaction with Martha Thompson permit only the inference that "any limitations from his impairment related to the *nature* of his social interactions and not his *ability* to interact at a basic fundamental level." (Def's br. at 15-16). Again, defendant is splitting hairs. The record supports the inference that plaintiff suffers from a developmental disorder which substantially affects the major life activity of interacting with others in that he is unable "to connect with others, *i.e.*, to initiate contact with other people and respond to them, or to go among other people." *Jacques*, 386 F.3d at 203. While

14

defendant cites *Jacques* to the effect that the plaintiff is not disabled under the ADA if his "communication is inappropriate, ineffective, or unsuccessful," *id.*, the record does not compel this conclusion. Rather, this case highlights a classic problem when disabled people try to function in mainstream society: co-workers either misinterpret plaintiff's behavior or simply feel uncomfortable being around him.

### B. Defendants Were Aware of Plaintiff's Disability

In *Brady v. Wal-Mart Stores*, 531 F.3d 127, 134 (2d Cir. 2008), the Court of Appeals sustained a verdict in favor of a disabled employee, finding in part that management perceived him as disabled. In that case, a supervisor "herself testified that she regarded Brady to be slow and that she 'knew there was something wrong' with him." Since management had reason to know that plaintiff was disabled because of the effects of his Cerebral Palsy, it had a duty to reasonably accommodate him. *See*, *id.* at 135 ("an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious – which is to say, if the employer knew or reasonably should have known that the employee was disabled"). *Brady* favorably cited *Felix v. New York City Transit Authority,* 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001), which stated that "application of this general rule [that a request for accommodation is a prerequisite to liability for failure to accommodate] is not warranted, however, where the disability is obvious or otherwise known to the employer without notice from the employee." 531 F.3d at 135.

Like the formal report recently drafted by plaintiff's therapists, which notes the "bizarreness of his nonverbal behaviors" (Exhibit 8 to Bergstein affirmation), Loretta McElwee's declaration permits the inference that defendant's agents, including Robin Darwin, knew or reasonably should have known that plaintiff was disabled. Mrs. McElwee attests that anyone

15

interacting with her son for even a brief period would know that he was developmentally-disabled. That inference is certainly supported by the report drafted by plaintiff's therapists. (Exhibit 8 to Bergstein affirmation). The psychological assessment annexed to Loretta McElwee's declaration further supports that inference. Indeed, Darwin testified that plaintiff "may have appeared to look a little slow" based on "his look, his face." (Darwin dep. 12). Darwin also recalled that, during her meetings with plaintiff to discuss the complaints against him, he acted strangely. *See, id.* at 16 ("when we spoke – certain things that he said, his mannerisms were very unusual"); *id.* at 18 (it struck Darwin as unusual that plaintiff told her that he talks to and also looks at a female employee); *id.* at 18 (plaintiff's reference to God was "not something you would normally hear from someone"); *id.* at 18-19 (it was unusual for plaintiff to make a hand-motion slitting his throat during the meeting; *id.* at 20 ("he just looked odd. It just was bizarre" when plaintiff made strange faces during the meeting); *id.* at 22 (it was "disturbing" when plaintiff told Darwin that she was a "conduit of God" in punishing him); *id.* at 23 (Darwin agreed that plaintiff "was saying things you wouldn't normally hear"); *id.* at 26 ("[i]n the course of our conversation, I would say he said unusual things"). Like the supervisor in *Brady*, Darwin also thought that, based on his appearance, plaintiff looked "slow." (Darwin dep. 12).

The jury may also find that Darwin knew that plaintiff had a disability because her notes from her conversation with plaintiff's mother makes reference to his disability. (Exhibit 2 to Bergstein aff.). Loretta McElwee told Darwin that the facility should not discriminate against plaintiff because of his disability. *Id.* Despite Darwin's conversation with plaintiff's mother on November 30, 2009, Darwin terminated plaintiff's involvement with the program the next day. (Exhibit 6 to Bergstein aff.). Darwin also ignored a December 2, 2009 request from plaintiff's

psychologist to discuss plaintiff after he was removed from the program. (Exhibit 3 to Bergstein aff.; Exhibit 8 to Bergstein aff., at 3). Darwin did not change her mind on removing plaintiff from the facility (Exhibit 6 to Bergstein aff.), causing him to suffer humiliation on December 10, 2009, when he was told he could not join the Christmas carolers at Valley View.

As "an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious – which is to say, if the employer knew or reasonably should have known that the employee was disabled," *Brady*, 531 F.3d at 135, the jury may find that it was obvious to Darwin knew that plaintiff was developmentally-disabled based on his unusual mannerisms, gestures and statements, particularly during their meetings when she told him about the complaints from female workers. As she has a Master's degree in health services and management (Darwin dep. 5), the jury may find that she knew or should have known that plaintiff was developmentally-disabled and that his behavior at Valley View may have been a manifestation of his disability.

### C. Plaintiff Was a Qualified Individual Under Federal Law

In *Sista v. CDC Ixis North America*, 445 F.3d 161 (2d Cir. 2006), the Court of Appeals clarified that the question whether an ADA discrimination plaintiff is qualified for his position is limited to whether he could perform his job duties. *Id.* at 171-72. The record establishes that McElwee was qualified for his volunteer position. Even Robin Darwin told plaintiff that he was a good volunteer. *See*, Exhibit B to Darwin aff. (Darwin told plaintiff that "you do a good job volunteering").

Defendant misconstrues the cases in arguing that plaintiff's alleged inappropriate behavior rendered him unqualified under the ADA. The Second Circuit in *Sista* confirmed that while the employer may cite the plaintiff's violent propensities as a legitimate reason for terminating

17

his employment, that defense arises after plaintiff makes out the *prima facie* case. *See*, 445 F.3d at 172 ("we conclude that the District Court erred in holding that Sista was not 'otherwise qualified' to reassume his position at CDC because he 'pose[d] a direct threat' to his co-workers"). In interpreting the ADA this way, the Second Circuit expressly repudiated the contrary cases cited in defendant's brief, including *Francis v. Runyon*, 928 F. Supp. 195 (E.D.N.Y. 1996) and *Palmer v. Circuit Court of Cook County*, 117 F.3d 351 (7th Cir. 1997).

Moreover, *in Powell v. National Bd. of Medical Examiners*, 364 F.3d at 84-85, the Court of Appeals noted that "[a] qualified individual with a disability is defined as a disabled person who, whether or not given an accommodation, 'meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" Plaintiff is a qualified individual because this longtime volunteer satisfied the facility's eligibility requirements and successfully participated in the volunteer program for years.

In any event, the cases cited by defendant are distinguishable in that they involve plaintiffs – some of whom were mentally ill – who physically threatened their superiors. Nothing in this record compares to the plaintiffs whose violent and threatening personalities warranted dismissal. *See, e.g., Tylicki v. St. Onge*, 297 Fed. Appx. 65 (2d Cir. 2008); *Palmer*, 117 F.3d at 352 and *Sista*, 445 F.3d at 165. Darwin's "transcript" memorializing her final conversation with McElwee shows her interrogating a frightened man over making another woman feel uncomfortable. Darwin did not recall that McElwee touched anyone (Darwin dep. 24-25), and her suggestive questioning forced McElwee to reveal embarrassing personal matters from high school. (Exhibit B to Darwin aff.). McElwee is not mentally-ill but a disabled individual with Asperger's, which falls on the autism spectrum. While his behavior may have made Valley View employees feel

18

uncomfortable, plaintiff did not threaten them with physical harm or touch them, and the jury may find that his alleged inappropriate interactions with these women were directly connected to his disability, which significantly affects his social skills.

*Tylicki v. St. Onge*, 297 Fed. Appx. 65 (2d Cir. 2008) is also distinguishable. The Court of Appeals held that plaintiff was not entitled under the ADA to the kind of manifestation hearing to which disabled students are entitled under the Individuals with Disabilities in Education Act. Defendant cites *Tylicki* for the proposition that "the ADA and the Rehabilitation Act permit [the college] to discipline a student even if the student's misconduct is the result of disability" and that "[the college] was entitled to suspend Tylicki even if his conduct was a manifestation of his alleged disability." (Def's br. at 20). However, that language is in the context of a college's right to discipline a disabled student without a "manifestation hearing," a procedure unique to the IDEA, which applies to students in public schools.

## POINT II

## PLAINTIFF WAS DENIED A REASONABLE ACCOMMODATION

"Title I of the ADA states that 'the term 'discriminate' includes ... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003) (quoting 42 U.S.C. § 12112(b)(5)(A)).

Darwin told McElwee that various female employees complained that he violated their personal space and that they felt uncomfortable around him. There is also no dispute that "Darwin

19

did not make any effort to meet with plaintiff and Thompson to discuss Thompson's Complaint about plaintiff and to either educate Thompson about plaintiff's disability or to otherwise better understand the nature of her concerns about plaintiff." (Complaint ¶ 15). *See*, Darwin dep. 28.

The jury may find in plaintiff's favor on his failure-to-accommodate claim. The record does not compel the conclusion that plaintiff is a violent man whose dangerous threats could not be reasonably accommodated. Rather, plaintiff has Asperger's Syndrome, and there is no evidence that he *intentionally* made anyone feel uncomfortable. At worst, others in the workplace misinterpreted plaintiff's behavior. However, as he attests, "I cannot control how [others] perceive[] me." (Plaintiff decl. ¶ 12). "Having worked there 13 years, I understood that colleagues who got to know me were aware of my disability and knew that I was harmless." *Id.* at ¶ 10. While defendant suggests that plaintiff wants to force public entities to "accommodate" persons with mental disorders by trying to "be more understanding" of their harassment (def's br. at 23), this case presents nothing of the sort. The jury is not required to find that McElwee was "harassing" women, and it was not an undue burden for nursing home officials to sit down with plaintiff and his female colleagues and clear the air over his unintentional behavior. More broadly, it was not an undue burden for the County to educate staff, residents and volunteers about the nature of plaintiff's disabilities, particularly since he was a valued volunteer and, according to Darwin's "transcript," he had never behaved like this at the facility before, as she told him "this is something new that you're doing." (Exhibit B to Darwin aff.). Darwin acknowledged at deposition that the County has not trained anyone to handle personnel disputes arising from developmental disabilities. (Darwin dep. 25). She also did not consult with any medical professionals or consider setting up a meeting with McElwee and the colleagues who complained about him to educate them about the nature of his disability in order to

20

emphasize that he is harmless, despite his strange mannerisms. *Id.* at 21, 24. Rather, Darwin decided to remove this otherwise qualified volunteer from the facility (*id.* at 22), even after plaintiff's mother told Darwin that her son was disabled. Darwin also failed to get in touch with plaintiff's therapist who wanted to discuss plaintiff's disability with her after plaintiff was terminated from the program. (Exhibit 8 to Bergstein aff., at 3). Calling Dr. Lalire would have better acquainted Darwin with plaintiff's disability and placed his otherwise bizarre actions and comments in context. Plaintiff's proposed accommodation would have saved his position, as co-workers would have come to understand that he was harmless and did not intend to harass anyone or make them feel uncomfortable.

For these reasons, defendant's reliance on *Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009), is misplaced. The plaintiff in *Harris* challenged the state's refusal to reinstate his medical license after he committed fraud and engaged in improper medical practices. His lawsuit alleged that, in revoking his license, the state did not accommodate his learning disabilities. *Id.* at 74. The Court of Appeals rejected his claim because the "complaint does not ... identify how Harris's disabilities affected the behavior that caused the revocation of his license, nor how those disabilities could be accommodated to reform this behavior." *Id.* As Harris wanted the state to relax its licensing standards to accommodate his disability, the Complaint failed to state a claim. *Id.*

While the plaintiff in *Harris* engaged in serious professional misconduct and lost his initial administrative challenge in state court, McElwee admits to no comparable offenses. The jury may instead find that facility employees misinterpreted his behavior and complained about him to Darwin, who jumped to conclusions and decided that plaintiff was harassing staff. McElwee is not asking this Court to relax the standards governing volunteers at Valley View. Instead, he challenges

21

defendant's failure to recognize that this long-time volunteer was harmless and that his alleged interaction with Martha Thompson and other women resulted in a misunderstanding that the facility could have easily cleared up by educating staff about the nature of plaintiff's disability, which affects his socialization and communication skills. Since plaintiff does not concede to any harassment as set forth in defendant's brief, summary judgment is improper.

Relatedly, defendant seeks summary judgment because McElwee did not request a reasonable accommodation. (Def's br. at 25). Citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006), defendant notes that plaintiffs are generally responsible for requesting the accommodation. However, as noted above, the Court of Appeals in *Brady* modified *Graves* in holding that the employer must offer an accommodation "where the disability is obvious or otherwise known to the employer without notice from the employee." 531 F.3d at 135. The Court explained,

> This view is consistent with the statutory and regulatory language, which speaks of accommodating "known" disabilities, not just disabilities for which accommodation has been requested. Indeed, a situation in which an employer perceives an employee to be disabled but the employee does not so perceive himself presents an even stronger case for mitigating the requirement that the employee seek accommodation. In such situations, the disability is obviously known to the employer, while the employee, because he does not consider himself to be disabled, is in no position to ask for an accommodation. A requirement that such an employee ask for accommodation would be tantamount to nullifying the statutory mandate of accommodation for one entire class of disabled (as that term is used in the ADA) employees. *Id.* at 135.

As plaintiff is limited in his communication skills and was a full-time volunteer who most likely was not aware of his rights under the ADA, his failure to request an accommodation for his obvious disability is not fatal to his claim.

22

## CONCLUSION

This Court should deny the motion for summary judgment in its entirety and allow the

parties to proceed to full discovery.

Dated:     January 20, 2011

Respectfully submitted,

STEPHEN BERGSTEIN

BERGSTEIN & ULLRICH, LLP
15 Railroad Avenue
Chester, New York 10918
(845) 469-1277
Counsel for plaintiff

23