UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
JAMES C. McELWEE,

               Plaintiff,

                                   10 Civ. 138 (KTD)

-vs-

COUNTY OF ORANGE,

               Defendant.
--------------------------------------------------X

### DECLARATION OF JAMES McELWEE IN
### OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

COUNTY OF ORANGE    )
                        )
STATE OF NEW YORK    )

      Pursuant to 28 U.S.C. § 1746, JAMES McELWEE states under penalty of perjury:

1.     I am the plaintiff in this action and submit this affidavit in opposition to

      defendant's motion for summary judgment.

2.     I am a 36 year-old man residing in Florida, New York. I am a disabled individual

      with Asperger's Syndrome, a developmental disorder on the autism spectrum

      characterized by problems in socialization and communication skills.

3.     In 1996, I began volunteering at Valley View, helping staff and residents with

      housekeeping responsibilities which include janitorial assignments and

      transporting residents within the building to and from religious and social

      activities. From 1996 until my termination in November 2009, I worked four days

      a week, between the hours of 9:00 a.m. and 3:00 p.m.

4.     The facility operates a formal volunteer program, comprised of some twenty to

thirty volunteers.  This program has a volunteer director, coordinates hours and tasks for volunteers and has an annual recognition program, providing pins, certificates and awards, to reward volunteers for their service.

5.      The volunteer program at Valley View benefitted me and other disabled volunteers as it improved our self-esteem and allowed us to fit within the larger community by providing a service to the elderly and infirm.  This is particularly true for autistic volunteers like me who lack the interactive social skills to consistently perform other jobs but also want to serve the community and improve upon our vocational and professional skills.

6.      On November 24, 2009, I was advised that a facility employee had complained about me.  In particular, the facility's assistant administrator, Robin Darwin, told me that a social worker, Martha Thompson, had complained that I violated her personal space and that she felt uncomfortable around me.

7.      In Robin Darwin's notes of her interview with Martha Thompson, she writes that Thompson told her that she was uncomfortable around me and that I waited in the Town Center at the Nursing Home and walked behind her when going to calls.

8.      The notes further state that when I walked in the hall I looked at Thompson's rear-end.  Thompson also told Darwin that on September 25, 2009, while walking in the hallway by the cafeteria, Thompson and I walked past each other and she turned and "caught him."  She asked me what was going on.  According to Thompson, I said, "I thought someone [was] calling me."

9.      Thompson also told Darwin that, a few times by the switchboard, when she stopped walking, I stopped walking, as I was following her every move.

10.   I had little interaction with Thompson. I do not recall speaking with her socially. I certainly never intended to make anyone feel uncomfortable. She may have inferred that I was looking at her in a sexual way, but I was not. I regard myself as a gentleman, and I would hold the door open for men and women. I am aware that, with my disability, people might take my facial expressions and comments the wrong way. But, having worked there 13 years, I understood that colleagues who got to know me were aware of my disability and knew I that was harmless.

11.   The notes from the Thompson interview state that I have waited in the gift shop "to watch her go out." I suspected that, for whatever reason, Thompson did not like having me around, so I waited for her to leave the shop to keep my distance from her.

12.   Thompson also told Darwin that on one occasion in the parking lot, I intentionally situated my car near her car and rolled down my windows to look at her. I do not know what kind of car Thompson drives. If I parked near her, it was coincidence. I do not recall rolling down my windows to look at her. I believe that Thompson was interpreting my behavior the wrong way, but I cannot control how she perceives me.

13.   These interview notes state that other women have also complained about me, including Liz Murphy and a woman identified as "Wayne's fiancé." I do not know who Liz Murphy is. The only Wayne that I knew was Wayne Beam. If that is the Wayne that she's talking about, I did not know he had a fiancé, and no one told me they had a problem with "Wayne's fiancé." I got along with Wayne Beam, who often encouraged me not to let certain co-workers get me down.

14.    Darwin's interview notes with Liz Murphy state that for the past few years, I have watched and followed her when walking on breaks. This escalated since the Spring, when I became "more visible" and was "there all the time." I am aware that Thompson had a friend named "Liz," and if that is the one Thompson is talking about, I got along with Liz and we would speak on general matters, but nothing personal. I do not know the context of Liz's complaints, but again, I never went out of my way to make anyone feel uncomfortable.

15.    The notes also say that Murphy told Darwin that I had recently sat and watched her give out paychecks. From what I recall, I knew that other workers handed out paychecks and was surprised to see her doing that task. I must have looked at her in a way that expressed surprise. Again, I did not intend to harass her or make her feel uncomfortable. She must have taken something I said or did the wrong way. She further told Darwin that the security guard told her that "he's had complaints about [me] from other women." None of these complaints were brought to my attention.

16.    Darwin also interviewed Barbara Decker, who told her that I was asked not to come by for a period of time when Maureen Coughlin was there. Decker further told Darwin that she saw me hit my head against the wall in frustration when I was denied a job in Staff Resources, located in the basement. I was escorted out when this happened. I recall in 1999 that I did apply for a job was rejected and was very upset, though I do not recall hitting my head against the wall. I may have hit my hand against my head.

17.    According to Decker, a social worker who no longer worked there said I had a

history of sexual behavior and that I would go around with a stuffed dolphin and ask people to pet it. The inference is that this dolphin had some kind of sexual meaning. I am not aware of any complaints of "sexual behavior." I recall the Dolphin toy. I was trying to entertain residents and colleagues with whom I felt comfortable. I will sometimes go through a phase where I acting younger than my years, and I will rub toys, including stuffed animals and treat them as live animals. I do not recall anyone at work telling me this was inappropriate behavior. Eventually I stopped bring in the stuffed dolphin.

18.   Decker also told Darwin that six or seven years ago (before she started avoiding me), I told her that her daughter was pretty and that I wanted to go out with her. Decker replied that her daughter was engaged to be married and that I responded that engagements can be broken. She added that "He used to watch me with peering eyes but I don't make eye contact." I remember asking Decker about her daughter, who was my age. There is nothing wrong with asking Mrs. Decker that question. I do not recall telling her that engagements can be broken. Perhaps I said it out loud to myself, and maybe she overheard me. Or maybe I was just joking with her.

19.   Darwin's notes state that this is the second woman who said she was uncomfortable with how I talked about her daughter, and that "due to this, we have young female volunteers who walk around him." I have no idea what this is about. Again, I regarded myself as a gentleman who did not want to offend anyone. I am aware that people can take my behavior the wrong way, but I cannot control how they perceive me.

likely joking around in casual conversation. I do not recall Matero overreacting

when I said it. I absolutely do not recall making any sexual comments to women

at work. No one ever told me that I was behaving inappropriately. As I have

Asperger's, I am aware that some people may take issue with my choice of words

and social interactions. I recall asking certain colleagues with whom I felt

comfortable if I was doing anything wrong in the way that I spoke to people, as I

sometimes wondered if I was saying anything that would make people feel

uncomfortable.

24.     No one at the nursing home ever suggested a meeting with any of my colleagues

about my disability and how to increase awareness about Asberger's and autism in

general. These educational efforts would have acquainted colleagues about the

nature of my disability and reassured them that while they might interpret my

behavior as unusual, I was harmless, and that any unusual behavior was a product

of my disability, which affects my social interactions.

25.     I never had a sit-down meeting with Martha Thompson about my disability, and

prior to our meeting shortly before my termination, I never had the opportunity to

explain myself and place anything that I did in context.

26.     On December 1, 2009, Darwin mailed me a letter stating that my volunteer

services were no longer needed at Valley View. As I did not work at the facility

from November 25 through the date of my termination, this stemmed solely from

Darwin's discriminatory job criticism on November 24, 2009.

27.     On December 10, 2009, I and other special-needs persons arrived at Valley View

to sing Christmas carols for the residents. We have sung carols at the facility for

several years. This activity is welcomed by the facility and its residents each year. When I arrived at the facility to sing Christmas carols, I was told by the security guard that I was not allowed inside the building because of "what had happened recently."

28.    I swear under penalty of perjury that the above is true and correct.


_Jomes McElwee_
JAMES McELWEE